1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   PATRICK MICHAEL LARMOUR,

11              Petitioner,              No. CIV S-08-1523 JAM DAD P

12        vs.

13   KEN CLARK, Warden,

14              Respondent.         FINDINGS AND RECOMMENDATIONS
     _____/

15

16              Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254.  The petition before the court challenges petitioner's 2006

18   conviction in the Shasta County Superior Court for first degree murder in violation of California

19   Penal Code §§ 187, 189, and for forcible rape in violation of California Penal Code § 261(a)(2).

20   Petitioner seeks relief on the grounds that the trial court's denial of his change of venue motion

21   violated his right to a fair trial.

22              Upon careful consideration of the record and the applicable law, the undersigned

23   will recommend that petitioner's application for habeas corpus relief be denied.

24                          PROCEDURAL BACKGROUND

25              On March 3, 2006, a jury found petitioner guilty of the first degree murder of

26   victim H. C. and of the forcible rape of victim K. W.  (Notice of Lodging Documents on Feb. 11,

                                        1

2009 (Doc. No. 15), Clerk's Transcript on Appeal ("CT") Vol. VII at 1874, 1880.)  The jury found petitioner not guilty of the attempted forcible rape of victim H. C. and of the rape of an unconscious victim, L. C.  (CT Vol. I at 237; Vol. VII at 1873, 1877-78.)  The jury also found a special allegation that petitioner murdered H. C. during the commission or attempted commission of a rape, not true.  (CT Vol. I at 237; Vol. VII at 1873, 1877-78.)  Pursuant to the jury's verdicts, on April 3, 2006, petitioner was sentenced to an aggregate state prison term of thirty-three years to life.  (Reporter's Transcript on Appeal ("RT") Vol. XIII at 3664.)

Petitioner appealed his judgment of conviction to the California Court of Appeal for the Third Appellate District.  On November 14, 2007, the judgment of conviction was affirmed in a reasoned opinion.  (Resp't's Lod. Doc. 4.)  Petitioner then filed a petition for review with the California Supreme Court.  (Resp't's Lod. Doc. 5.)  On January 23, 2008, the California Supreme Court summarily denied that petition.  (Resp't's Lod. Doc. 6.)

On July 2, 2008, petitioner filed the federal habeas petition now pending before the court.  (Doc. No. 1.)  Respondent filed an answer on January 23, 2009.  (Doc. No. 14.)  Petitioner has not filed a traverse.[1]

## FACTUAL BACKGROUND

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> At the time of trial, defendant was 20 years old.  At about age 13, during the transition from middle school to high school, defendant became sexually active.  On two or three occasions, defendant covered the mouth of one of his high school girlfriends while they were having sex.  He told the same girlfriend he could "kill someone and get away with it," and he could hide a body "off

---

[1] On March 24, 2010, petitioner was allowed 30 days in which to file what appeared to be a page missing from his petition.  (Doc. No. 16.)  Petitioner was advised that a failure to submit the missing for filing would result in the court issuing findings and recommendations based on the petition in its current form.  As of the date of these findings and recommendations, petitioner has not filed the apparently missing page.

road" "No. 4" and "no one would ever find it."[FN]  That same girlfriend also saw defendant looking on his computer at videos of a man strangling a woman while having sex and at photographs of dead, unclothed women.  She knew that defendant had cut off the heads of "road kill" and kept the skulls.

> FN. Defendant made similar statements to another girlfriend.

## A
### *Forcible Rape Of K. W.*

K. W. was 17 years old at the time of trial.  In August 2002, when she was 14 years old, she began her freshman year of high school in Redding.  Within a few weeks, she met defendant on the school bus and developed a crush on him.  Twice, early in the school year, he asked her to go to lunch with him and took her to McDonald's.  The third time, he took her to his parents' house because he said he did not have any lunch money.

When they got to the house, K. W. sat on the couch, and defendant went into the bathroom.  About five minutes later, defendant emerged from the bathroom and sat next to K. W. on the couch.  He put his hand on her inner thigh and moved his hand toward her "crotch."  K. W. told defendant, "'don't,'" and tried to remove his hand.  Defendant shoved her, and K. W. fell back onto the couch.  He held her down by her neck and shoulders and removed her pants and underwear.  K. W. was crying and telling him to stop.  Defendant told her to be quiet and said if she did not, she "would end up like the bear on the wall."  Defendant took off his pants, revealing an erect penis covered with a condom.  He penetrated her with his penis for a few minutes, but stopped when a car with two boys pulled into the driveway.  K. W. went to the bathroom and discovered she was bleeding.

After the boys left, defendant drove K. W. back to school and told her that he would kill her if she told anyone.

About a year later, defendant, laughing, told an ex-girlfriend that he had taken a 14-year-old girl's virginity on his parents' couch.

K. W. reported the rape after defendant was arrested for H. C.'s murder.

## B
### *Alleged Rape Of L. C. While She Was Unconscious* [FN]

> FN. Although the jury acquitted defendant of this offense, as defendant points out, the allegation still could have been used as evidence of intent under Evidence Code section 1101 or as evidence of

3

propensity under Evidence Code section 1108.

L. C. and her friend T. S. had known defendant "[o]ff and on" since they were teenagers.  In May 2003, when L. C. was 17 years old and living in the same Redding apartment complex as T. S., defendant came over to T. S.'s apartment while the two girls were "[s]moking pot."  A half an hour later, the girls decided to "ditch" defendant and "do some drugs."

L. C. and T. S. went to L. C.'s apartment, but defendant followed. They all drank brandy, and then defendant offered them a little bit of cocaine, which they all snorted.  After they ran out of cocaine, T. S. got a phone call and walked outside of the apartment.

Defendant asked L. C. if she "wanted to do more" and offered her an off-white powdery substance that was packaged the same way as the cocaine.  L. C. ingested some of the drug and "felt pretty numb."  She was unable to move, speak, or feel any part of her body, but could still see and hear.  She saw defendant's head above her and heard him say he "felt good."  L. C. could not see what defendant was doing and whether they were still wearing clothes.

According to T. S., she reentered L. C.'s apartment about 20 to 25 minutes after she had left and saw L.C. and defendant having sex on the couch.  T. S. was mad because she "didn't expect to see that," and went to her parents' house where she summoned her brother and his friends to kick defendant out of L. C.'s apartment.

Back at the apartment, L. C., scared and numb, wanted to tell defendant "'no'" but was unable to speak.  At some point, L. C. "came to" and was able to feel her body again.  She was on the floor with her clothes on, and defendant was lying by the couch. She thought she had been vaginally penetrated because her vaginal area was wet, her thighs were bruised, and "[she] hurt."  L. C. "[f]reaked out" and started yelling.

When T. S.'s brother and friends arrived at L. C.'s apartment, they told defendant to leave.  Defendant complied.  L. C. "was kind of hysterical," appeared intoxicated, and looked as though she had been crying.  L. C. came out of her apartment, and T. S. heard her say that she had been raped.

L. C. reported to police what had happened after defendant was arrested for H. C.'s murder.

C
*Murder Of H. C.*

In the evening on August 3, 2003, defendant and H. C. were guests at a house party in Redding attended by about 25 people.  Prior to the party, the two did not know each other.  By about 1:00 or 2:00

4

a.m., approximately nine people remained, including defendant and H. C.  They both were drinking, H. C. heavily, and they appeared happy.  They danced together, but there was no "groping" or "inappropriate" touching.  A few hours later, they were "hanging out" and "flirting."

One of H. C.'s friends decided it was not safe for H. C. to drive, so he hid her car keys.  H. C.'s friend left at 6:00 or 6:30 a.m.  By that point, defendant and H. C. were the only remaining guests who were awake.

On August 4, 2003, H. C. did not show up at work for either her morning job or evening job, which was very unusual.

Around the time H. C. disappeared, defendant told police that he had driven a person named "Kathleen" to her apartment complex after the party and helped her to her door.  She told defendant she had lost or misplaced her key and was going to find the maintenance man so she could get into her apartment.  Defendant offered to help, but "Kathleen" declined, and he left.

Four months later, in December 2003, defendant confessed to his childhood friend C. M. that he had killed H. C.  Defendant explained that he had taken H. C. home after the party, and when she could not find her key, he took her back to his parents' house.  H. C. wanted to have sex, but he did not.  H. C. threatened to tell a coworker that defendant was a "faggot."  Defendant backhanded her, she started fighting and scratching him, he pushed her, and she tripped over the coffee table and fell onto the couch.  Defendant jumped on top of her and started choking her.  "[H]er eyes filled with blood vessels and ... she lost all bowel functions."  He continued choking her for a couple more minutes "to make sure that she was dead."  Defendant got a tarp from the garage and tied up H. C.'s body in the tarp.  He put her in the passenger seat of his truck.  He heard her "'groaning'" or "'moaning.'"  He drove four miles up "Trail 4" and buried H. C. in a shallow grave about 15 feet from the road.  He took $150 from her purse and disposed of her purse and cellular phone.  Defendant said H. C. "was a stupid bitch and she deserved it."  He said that "it" was "exhilarating," "the power in his hands was such an adrenaline rush, there was nothing like it," and he was thinking about doing it again, "'probably in about a year or so.'"

Soon after defendant confessed, C. M. called "Secret Witness" and spoke to police.  Police drove to the area where defendant had buried H. C.'s body and found bone fragments, teeth, and skeletal remains that belonged to H. C.

(Resp't's Lod. Doc. 4 (hereinafter Opinion) at 2-7.)

/////

5

ANALYSIS

I. <u>Standards of Review Applicable to Habeas Corpus Claims</u>

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts.  <u>See</u> <u>Peltier v. Wright</u>, 15 F.3d 860, 861 (9th Cir. 1993); <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing <u>Engle v. Isaac</u>, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.3d 1146, 1149 (9th Cir. 2000); <u>Middleton</u>, 768 F.2d at 1085.  Habeas corpus cannot be utilized to try state issues <u>de</u> <u>novo</u>.  <u>Milton v. Wainwright</u>, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997); <u>Clark v. Murphy</u>, 331 F.3d 1062, 1067 (9th Cir. 2003).  Title 28 U.S.C. § 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

<u>See also</u> <u>Penry v. Johnson</u>, 532 U.S. 782, 792-93 (2001); <u>Williams v. Taylor</u>, 529 U.S. 362 (2000); <u>Lockhart v. Terhune</u>, 250 F.3d 1223, 1229 (9th Cir. 2001).  If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims.  <u>Delgadillo v. Woodford</u>, 527 F.3d 919, 925 (9th Cir. 2008).  <u>See also</u> <u>Frantz v. Hazey</u>, 513 F.3d 1002, 1013 (9th Cir. 2008) (en banc) ("[I]t is now clear both that

we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such

error, we must decide the habeas petition by considering de novo the constitutional issues

raised.").

The court looks to the last reasoned state court decision as the basis for the state

court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  If the last reasoned

state court decision adopts or substantially incorporates the reasoning from a previous state court

decision, this court may consider both decisions to ascertain the reasoning of the last decision.

Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  Where the state court

reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

habeas court independently reviews the record to determine whether habeas corpus relief is

available under § 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle v.

Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  When it is clear that a state court has not reached

the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's

deferential standard does not apply and a federal habeas court must review the claim de novo.

Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

II.  Petitioner's Claim

Petitioner's lone assertion is that the trial court's denial of his change of venue

motion violated his right to a fair trial.  In support of his argument petitioner provides a list of

"examples of bias." (Pet. at 4, 7-8.)[2]  Petitioner cites several examples of local and national

media coverage of the victim's disappearance and his subsequent arrest.  (Id. at 7.)  Petitioner

also states that, because the county was "so small," the media coverage resulted in a high

percentage of jurors who had been exposed to the media reports.[3]  (Id. at 8.)

---

[2]  Page number citations such as this one are to the page number reflected on the court's CM/ECF system and not to page numbers assigned by petitioner.

[3]  Petitioner also notes that several empaneled jurors recognized people from the general public who witnessed the trial, that one juror realized he knew a courtroom employee, and that one juror was told by a restaurant patron that petitioner was her "friend."  (Pet. at 8.)  Petitioner

1          The California Court of Appeal specifically rejected petitioner's argument that the

2   trial court erred in denying his motion for a change of venue.  The court reasoned as follows:

3          In November 2005, defendant filed a motion for change of venue,
           contending he could not receive a fair and impartial trial in Shasta
4          County because of "[t]he widespread, pervasive and negative
           nature of the media reports surrounding this case."  In support of
5          his motion, defendant submitted data from a public opinion survey
           of Shasta County residents conducted in September 2005.

6
           In early December 2005, the court denied the motion without
7          prejudice to its renewal for an evidentiary hearing.

8          In late December 2005, the court held an evidentiary hearing on the
           change of venue motion.  The court again denied the motion
9          without prejudice to its renewal following jury voir dire,
           commenting that "since the factors do not point to the need to
10         change venue in the first instance, the better approach is going to
           be to try to impanel the jury."

11
           The seven-day voir dire took place in January 2006.  In mid-
12         January, defendant renewed his change of venue motion for a final
           time in the trial court.  The court denied the motion, reasoning in
13         part that although this "case may have had a high amount of media
           attention and is even a case that had been heard of by a large
14         percentage of the jury pool," that "does not . . . justify on its own a
           change of venue."

15
           On appeal, defendant renews his claim that a change of venue from
16         Shasta County should have been granted.

17         In a criminal case, when the defendant moves for a change of
           venue, the trial court must grant the motion "when it appears that
18         there is a reasonable likelihood that a fair and impartial trial cannot
           be had in the county."  (Pen. Code, § 1033, subd. (a).)  "In
19         reviewing the trial court's decision [denying a change of venue],
           we independently examine the record to determine whether in light
20         of the failure to change venue, it is reasonably likely that defendant
           in fact received a fair trial.  [Citations.]  The de novo standard of
21         review applies to our consideration of the five relevant factors: (1)
           nature and gravity of the offense; (2) nature and extent of the
22         media coverage; (3) size of the community; (4) community status
           of the defendant; and (5) prominence of the victim."  (People v.
23         Sully (1991) 53 Cal.3d 1195, 1236-1237.)  "On appeal the
           appellant must demonstrate that the ruling was error because it was

24

25   also alleges that on one occasion the prosecutor discovered that he and several jurors were eating
     at the same restaurant.  Petitioner does not explain the significance of these assertions.  The
26   court, however, finds that even if true these facts alone would not establish any juror bias.

8

reasonably likely that a fair trial could not be had and that the error was prejudicial because a fair trial was in fact denied." (People v. Hayes (1999) 21 Cal.4th 1211, 1250.)  A review of the foregoing five factors demonstrates that the court did not err in denying defendant's change of venue motion.

A

*Nature And Gravity Of The Offense*

"The peculiar facts or aspects of a crime which make it sensational, or otherwise bring it to the consciousness of the community, define its 'nature'; the term 'gravity' of a crime refers to its seriousness in the law and to the possible consequences to an accused in the event of a guilty verdict." (Martinez v. Superior Court (1981) 29 Cal.3d 574, 582.)

Here, defendant was charged with murdering a young woman while raping or trying to rape her and burying her in a shallow grave off a dirt road and with raping two minors - one who was a 14-year-old virgin and another whom he rendered unconscious before raping.  Because he was a minor when the alleged crimes were committed, defendant was not subject to the death penalty but, rather, life in prison without the possibility of parole.

We believe the nature of charged crimes and their gravity "is a factor that would tend to support a change of venue, but not to the degree of a case involving serial murders, for example." (People v. Proctor (1992) 4 Cal.4th 499, 524; see People v. Fauber (1992) 2 Cal.4th 792, 818.)  We cannot say, therefore, this factor weighed "compellingly" in favor of a change of venue. (People v. Hamilton (1989) 48 Cal.3d 1142, 1159.)

B

*Size Of The Community*

"In a small town, in contrast to a large metropolitan area, a major crime is likely to be embedded in the public consciousness with greater effect and for a longer time. [Citation.]  Thus, . . . when trial is scheduled in a small rural community, even though the publicity is not inflammatory and not hostile toward the defendant, the courts have granted" a change of venue. (Martinez v. Superior Court, supra, 29 Cal.3d at p. 581.)

Here, the estimated population of Shasta County in 2005 when defendant brought his change of venue motion was 178,197 residents, which made it number 29 in size out of the 58 counties in California.  The charged crimes were alleged to have occurred in or around Redding, an arguably urban part of the county.  This factor, therefore, weighs against a change of venue. (Compare People v. Proctor, supra, 4 Cal.4th at pp. 514, 525-526 [where the murder took place in "a small mountain community located 35

9

miles east of Redding in Shasta County" and the population of Shasta County at the time was approximately 122,100, these facts weighed "somewhat in favor of a change of venue."] )

## C
### Community Status Of The Defendant

The status of the defendant as a stranger or undesirable person in the community may weigh in favor of a change of venue.  (See Martinez v. Superior Court, supra, 29 Cal.3d at pp. 584-585.)  The trial court here noted that defendant was "not an outsider in the community" as he grew up in Shasta County and went to school there.  He also was not a member of a minority group.  (Compare Williams v. Superior Court (1983) 34 Cal.3d 584, 594 [where defendant was a nonresident and an African American in a county where only 402 of the 117,000 residents were African American, the status of defendant weighed in favor of a change of venue].)

Defendant contends, however, that media coverage of the case portrayed him unfavorably and therefore his community status favored a change of venue.  We will address the nature and extent of the media coverage below.  In the absence of that coverage, there was nothing about defendant's status in the community that suggested a change of venue was necessary.  Thus, this factor did not support a change of venue.

## D
### Prominence Of The Victim

The victim's status in the community as "well known or well liked, or both," may weigh in favor of a change of venue.  (Martinez v. Superior Court, supra, 29 Cal.3d at p. 584.)  Here, as defendant admits, H. C. "was not well known" in the community before her disappearance.  To the extent the media coverage gave H. C. a certain amount of prominence after she disappeared, we consider that as part of the nature and extent of the media coverage. Otherwise, this factor did not support a change of venue.

## E
### Nature And Extent Of The Media Coverage

As defendant recognized, the most important factor here was the nature and extent of the media coverage.  The possibility of an unfair trial may arise from news coverage that is inflammatory or productive of overt hostility or from widespread publicity that describes facts, statements, and circumstances which tend to create a belief in the guilt of someone charged with a crime.  (Martinez v. Superior Court, supra, 29 Cal.3d at p. 580.)  In evaluating the extent of coverage, we consider matters such as the length and frequency of the articles, as well as their placement and prominence.  (People v. Hamilton, supra, 48 Cal.3d at pp. 1157-

1158.)  In evaluating the nature of the coverage, we look to the content of the reporting.  If the coverage has been inflammatory or sensational, a venue change is more likely.  (<u>Corona v. Superior Court</u> (1972) 24 Cal. App.3d 872, 877.)  Coverage that includes editorials about the crime and its ramifications weighs in favor of a venue change, as does coverage that is inaccurate or reports facts that would be inadmissible at trial.  (<u>People v. Hamilton</u>, <u>supra</u>, 48 Cal.3d at p. 1157; <u>Corona</u>, at pp. 877-878.)  On the other hand, reporting that is on the whole not "inflammatory, sensational, or hostile," does not warrant a venue change.  (<u>Odle v. Superior Court</u> (1982) 32 Cal.3d 932, 939)

The evidence defendant produced to support his change of venue motion showed that from the time of H. C.'s disappearance in August 2003 until the time of the first change of venue motion in November 2005, the local newspaper-Record Searchlight-mentioned this case in its print and online newspaper at least 99 times in various forms, including in articles, columns, crime blurbs, and letters to the editor.  The television (and radio) coverage largely paralleled the print and online media.  While the sheer number of times the case was mentioned in the media seems to weigh in favor of a change of venue motion, a review of that reporting shows that it was relatively limited in scope and factual in nature.  For example, the majority of reporting only mentioned the case briefly and many of the reports did not name defendant even after he was identified as a person of interest and later charged as a suspect.  Of the articles and crime blurbs that detailed H. C.'s death and defendant's involvement, they revealed mainly details of the crimes that were admitted at trial.  Of the letters to the editor and columns mentioning the case, they included commentary that there had yet to be a "trial in a court of law with sworn testimony and cross-examination" and that defendant "is also a very fine young person" who comes from a good family with morals.  Contrary to defendant's claim that Record Searchlight printed "sensational details" about the crime, a review of the entire media history in this case shows even-handed coverage of the case that did not weigh in favor of a change of venue motion.  In sum, although the media reporting of the accounts of the crime were frequent and steady beginning with H. C.'s disappearance and continuing through the time of the change of venue motion, the accounts were predominantly factual, contained little inflammatory matter, and lacked revelations of incriminating evidence that were not properly admitted at the trial.

Nevertheless, defendant emphasizes that in addition to this coverage, there was an entire Web site devoted to H. C., which, by our count, reportedly posted more than 2,200 messages to H. C.'s family from September 2003 to May 3, 2005, and a public opinion survey of Shasta County residents regarding this case showing that of 410 people interviewed in September 2005, 69 percent believed defendant was guilty of "murder."  As to the Web site, even

defendant's own expert witness testified that entries made by people visiting the Web site were not limited to residents in Shasta County and therefore "clearly not members of the jury pool, although local people could read some of that material." As to the results of the public opinion survey that showed 69 percent of respondents believed defendant was guilty of "murder," defendant admits that the question in this case was not whether defendant killed H. C., as he confessed that he had, but about his mental state when he killed her. While in the law the term "murder" connotes legal culpability for a killing, the study did not define the term murder, and we have no reason to believe the individuals responding to the survey interpreted the term "murder" in its legal sense.

Finally, the record of voir dire and the verdicts in this case demonstrate no reasonable likelihood that the trial was actually unfair. Although defendant points out that a majority of the potential jurors, as well as a majority of the actual jurors, admitted having been exposed to pretrial publicity about the case, "[i]t is not necessary that jurors be entirely ignorant of the facts and issues involved in the case; it is sufficient that they can lay aside their opinions and impressions and render a verdict based on the evidence presented at trial." (People v. Sanders (1995) 11 Cal.4th 475, 506.) Here, although only one of the jurors and alternates whom defendant has identified as those selected to hear the trial had not heard about the case, virtually all of the remaining jurors and alternates said they had formed no opinion about the case (and the one who had formed an opinion said she did not believe that her opinion was so strongly held that she could not set it aside). Indeed, as the verdicts reflect, the jury was able to set aside negative opinions they may have formed about defendant, as they returned a mixed verdict acquitting defendant of the attempted forcible rape of H. C. and the rape of L. C. while she was unconscious and found not true the special circumstance allegation that he had murdered H. C. during the commission or attempted commission of rape.

Viewing all of the relevant factors together, "[w]e cannot discern a reasonable likelihood that the jurors chosen for defendant's trial had formed such fixed opinions as a result of pretrial publicity that they could not make the determinations required of them with impartiality." (People v. Sanders, supra, 11 Cal.4th at pp. 506-507.) Accordingly, we find no error, constitutional or otherwise, in the denial of a change of venue from Shasta County.

(Opinion at 7-15.)

The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961). See also Green v.

White, 232 F.3d 671, 676 (9th Cir. 2000).  If prejudicial pretrial publicity makes it impossible to obtain an impartial jury, then the trial judge must grant the defendant's motion for a change of venue.  Daniels v. Woodford, 428 F.3d 1181, 1210 (9th Cir. 2005); Gallego v. McDaniel, 124 F.3d 1065, 1070 (9th Cir. 1997); Harris v. Pulley, 885 F.2d 1354, 1361 (9th Cir. 1988). However, jurors are not required to be totally ignorant of the facts and issues involved in a case. Irvin, 366 U.S. at 722; see also Murphy v. Florida, 421 U.S. 794, 800 (1975); United States v. Sherwood, 98 F.3d 402, 410 (9th Cir. 1996).  It is sufficient if the jurors can lay aside their impressions or opinions and render a verdict based on the evidence presented in court.  Holt v. United States, 218 U.S. 245 (1910); United States v. Dischner, 974 F.2d 1502, 1525 (9th Cir. 1992) (issue is whether jurors could impartially judge the defendant, not whether they remembered the case), overruled on other grounds by United States v. Morales, 108 F.3d 1031, 1035 n. 1 (9th Cir. 1997).

The Ninth Circuit employs a two-pronged test to determine if a petitioner's rights to due process and a fair and impartial jury have been violated by excessive and unfair publicity. Gallego, 124 F.3d at 1070; Harris, 885 F.2d at 1361;  935 F.2d 1007, 1014 (9th Cir. 1991); Hart v. Stanger.  Specifically, a petitioner must show that either prejudice should be presumed or that actual prejudice existed.  Turner v. Calderon, 281 F.3d 851, 865 (9th Cir. 2002); Hart, 935 F.2d at 1014 (citing Murphy, 421 U.S. at 800).

The duty of a federal court reviewing such a claim in a habeas corpus proceeding is to "make an independent review of the record to determine whether there was such a degree of prejudice against the petitioner that a fair trial was impossible."  Harris, 885 F.2d at 1360 (quoting Bashor v. Risley, 730 F.2d 1228, 1234 (9th Cir. 1980)).  See also Daniels, 428 F.3d at 1210.  To this end, a "reviewing court must independently examine the news reports for volume, content and timing."  Harris, 885 F.2d at 1360.  A court must also consider whether the jurors had such fixed opinions they could not impartially judge the guilt of the defendant.  Patton v. Yount, 467 U.S. 1025, 1035 (1984).

A. Presumed Prejudice

Prejudice may be presumed if the record demonstrates the trial venue was saturated with prejudicial and inflammatory publicity about the crime; however, prejudice is presumed only in extreme circumstances. Gallego, 124 F.3d at 1070; United States v. Croft, 124 F.3d 1109, 1115 (9th Cir. 1997). See also Rideau v. Louisiana, 373 U.S. 723, 726 (1963) (prejudice presumed where the case involved the televising of an in-jail twenty minute interrogation of the defendant by the police in which the defendant confessed to the murder for which he was subsequently convicted); Estes v. Texas, 381 U.S. 532, 536-38 (1965) (prejudice presumed where the press was allowed to sit within the bar of the court and to overrun it with television equipment); Sheppard v. Maxwell, 384 U.S. 333, 357, 362 (1966) (prejudice presumed where media accounts contained inflammatory, prejudicial information that was not admissible at trial).

In determining presumed prejudice, three factors should be considered: (1) whether there was a "barrage of inflammatory publicity immediately prior to trial, amounting to a huge . . . wave of public passion"; (2) whether the news accounts were primarily factual because such accounts tend to be less inflammatory than editorials or cartoons; and (3) whether the media accounts contained inflammatory or prejudicial material not admissible at trial. Daniels, 428 F.3d at 1211 (citing Ainsworth v. Calderon, 138 F.3d 787, 795 (9th Cir. 1998)).

Here petitioner cites in support of his claim the frequent reporting by the county's most prominent newspaper, the Record Searchlight, concerning H. C.'s disappearance.[4] (Pet. at 7.) Petitioner also notes that "thousands" of flyers were distributed, that the victim's family

---

[4] Petitioner offers a chronology of media reports that ends at the time of his arrest. (Pet. at 7.) As noted above, the petition before this court appears to be missing a page. That page would follow this chronology. It is possible, perhaps even likely, that petitioner's version of the chronology of events would continue on the missing page. Nevertheless, as noted above, petitioner has not provided the missing page. The court, however, was exhaustive in its analysis and it is unlikely that consideration of petitioner's claim has suffered as a result of the missing page.

1   purchased two billboards along a major interstate highway, and that stories concerning H. C.'s

2   disappearance appeared on national television programs, including "America's Most Wanted,"

3   and "Good Morning America." (Id.) What petitioner does not argue, however, is that any of the

4   media accounts were inflammatory, were not factual, or contained prejudicial material not

5   admissible at trial. The court's review of the media reports provided in the record results in the

6   conclusion that they were primarily, if not exclusively, factual, could not be characterized as

7   inflammatory, and did not contain prejudicial information not admitted into evidence at

8   petitioner's trial.

9          The first report by the Record Searchlight appears to have been on August 6,

10  2003, when the paper reported H. C.'s disappearance. (Augmented Clerk's Transcript on

11  Appeal, ("ACT") Vol. I at 107.) Petitioner was not named in this early news report, or those to

12  follow prior to his arrest, and was instead identified only as the "17-year-old" who "dropped [the

13  victim] off" outside her home, and who was described by the police as "cooperative." (Id. at

14  107-108.) The newspaper's reports continued in this fashion for several months, with petitioner

15  being identified only by his age and with the reports focusing almost exclusively on the status of

16  the missing victim. In one report police officers indicated that the "17-year-old boy" was "not a

17  suspect but a 'person of interest' - - one of about 100." (ACT Vol. II at 216.)

18         Finally, on December 19, 2003, the paper reported that the victim's remains had

19  been found and that petitioner, now identified by his name, had been arrested on suspicion of

20  murder. (Id. at 246.) From that time forward the newspaper's reports were primarily triggered

21  by developments in petitioner's prosecution. (See id. at 278 "Suspect in Carpenter Killing Pleads

22  Innocent"; id. at 296 "Judge Orders Murder Trial"; id. at 329 "Rape Added to List of Charges".)

23         There were, however, some instances of media coverage not relating to

24  petitioner's prosecution of petitioner. For instance one editorial ran in which the writer claimed

25  that the "tragedy hurt[] both families," referring to H. C.'s family and petitioner's family, and

26  described petitioner as "a very fine young person." (Id. at 290.) There was also an editorial from

15

the prosecutor decrying the media's violation of a court order prohibiting "photography or video coverage of any civilian witness," in which the prosecutor stated that "[a]t issue in the case is the vicious killing of a innocent young woman and this defendant's right to a fair trial and an unbiased jury in the face of potential life imprisonment." (Id. at 301.)  This court has been unable to locate any news editorial within the record before it that could be characterized as inflammatory.

There was also an article interviewing the two alleged rape victims.  (Id. at 335.) The article, however, was not extensive and the statements attributed to the victims is very similar to the statement of facts provided by the state appellate court in its opinion affirming petitioner's conviction.[5]  While there was media coverage by outlets other than the Record Searchlight, the voluminous transcripts of these reports show that these other news accounts largely paralleled the Record Searchlight's coverage, as noted by the state appellate court.  (See Id. Vol. II at 395-Vol. V at 1184; Opinion at 13.)

While there is no question that the victim's disappearance, and petitioner's subsequent arrest and prosecution for her murder, generated a tremendous amount of local media coverage, and even some national coverage, it cannot be said that those media accounts were "inflammatory" or contained prejudicial material not admissible at petitioner's trial.  Moreover, the vast majority of the reports appear to have been factual, with only a few, non-inflammatory, editorials.

Accordingly, having reviewed the record, this court finds that there was not a barrage of inflammatory publicity immediately prior to petitioner's trial, that the news accounts were primarily factual, and that the media accounts did not contain inflammatory or prejudicial material not admissible at trial.  Prejudice to petitioner stemming from those accounts, therefore, may not be presumed.

---

[5] The jury found petitioner guilty of rape as to one of these victims and not guilty of rape as to the other.

1       B.  Actual Prejudice

2               Actual prejudice exists if the jurors demonstrated actual partiality or hostility.  See

3   Irwin, 366 U.S. at 728 (actual prejudice found where eight of the twelve empaneled jurors had

4   already formed the opinion that the defendant was guilty, and 268 of the 430 potential jurors

5   were excused for cause because they indicated some degree of belief in the defendant's guilt);

6   Daniels, 428 F.3d at 1211; Harris, 885 F.2d at 1363.  Here, of the 18 jurors and alternates

7   empaneled at petitioner's trial, one had not heard about the case or formed an opinion about it.

8   (See Reporter's Transcript of Augmented Record on Appeal ("ART") Vol. III at 852-66; ACT

9   Vol. VII at 1778-80 for **Juror No. 137307**.)  Another six juror vaguely recalled hearing and/or

10  reading about the case but had formed no opinion about it.  (See ART Vol. II at 397, ACT Vol.

11  VII at 1829-31 for **Juror No. 183405**; ART Vol. II at 423-24, ACT Vol. VII 1846-48 for **Juror**

12  **No. 107326**; ART Vol. II at 435-36, 464-65, ACT Vol. VII at 1863-65 for **Juror No. 63250**;

13  ART Vol. II at 438-39, 442, 458-59, ACT Vol. VII 1880-82 for **Juror No. 185111**; ACT Vol.

14  VII at 1897-99 for **Juror No. 124966**; and ACT Vol. VIII at 1965-67 for **Juror No. 169157**.)

15  Nine more jurors recalled hearing and/or reading about the case but had not formed an opinion

16  about it.  (See ART Vol. I at 285-86, ACT Vol. VII at 1727-29 for **Juror No. 110888**; ART Vol.

17  I at 290-91, ART Vol. II at 308, ACT Vol. VII at 1744-46 for **Juror No. 122399**; ART Vol. II at

18  329, ACT Vol. VII at 1761-63 for **Juror No. 88863**; ACT Vol. VII at 1795-97 for **Juror No.**

19  **116390**; ACT Vol. VII at 1812-14 for **Juror No. 83750**; ART Vol. III at 705-06, ACT Vol. VII

20  at 1914-16 for **Juror No. 109802**; ART Vol. III at 709-10, ACT Vol. VIII at 1931-33 for **Juror**

21  **No. 139148**; ACT Vol. VIII at 1948-50 for **Juror No. 106207**; and ART Vol. III at 785-90 for

22  **Juror No. 149891**.)  One juror recalled reading and/or hearing about the case and had formed an

23  opinion about it, but stated that opinion was not so strongly held that it could not be set aside.

24  (See ART Vol. III at 762-66, ACT Vol. VII at 1710-12 for **Juror No. 129376**.)[6]

25

26          [6] The court could not locate either a juror questionnaire or voir dire transcript for Juror
    No. 103123.  (See ART Vol. III at 760.)

17

1    The United States Supreme Court has stated that qualified jurors need not be

2  totally ignorant of the facts and issues involved in a case.  <u>Murphy</u>, 421 U.S. at 800.  The

3  Supreme Court reasoned that:

4           'To hold that the mere existence of any preconceived notion as to
            the guilt or innocence of an accused, without more, is sufficient to
5           rebut the presumption of a prospective juror's impartiality would be
            to establish an impossible standard.  It is sufficient if the juror can
6           lay aside his impression or opinion and render a verdict based on
            the evidence presented in court.'
7

8  (<u>Id.</u>) (quoting <u>Irvin</u>, 366 U.S. at 723).  <u>See also</u> <u>Gallego</u>, 124 F.3d at 1071 (petitioner failed to

9  establish actual prejudice where none of the seated jurors were shown to have formed an opinion

10  that he was guilty of charged crimes and all the jurors had indicated that they would follow the

11  law); <u>Jeffries v. Blodgett</u>, 5 F.3d 1180, 1189 (9th Cir. 1993) (concluding that no actual prejudice

12  occurred even though almost all of the jurors had heard or read about the case prior to trial,

13  because all of the jurors swore under oath that they could judge impartially the defendant's guilt

14  or innocence).

15    Here, only one juror had a preconceived opinion about the case based upon what

16  he/she had read or heard and that juror stated in response to questioning that he/she would be

17  able to set aside that opinion.  Thus, it does not appear that any juror demonstrated actual

18  partiality against or hostility towards petitioner sufficient to support a finding of actual prejudice.

19    Actual prejudice may also be found where the degree of adverse pretrial publicity

20  has created a community-wide sentiment against the defendant, such that the jurors' claims that

21  they can be impartial should not be believed.  <u>Irvin</u>, 366 U.S. at 728; <u>Patton</u>, 467 U.S. at 1031.

22  "[A] key factor in gauging the reliability of juror assurances of impartiality is the percentage of

23  veniremen who 'will admit to a disqualifying prejudice.' "  <u>United States v. Collins</u>, 109 F.3d

24  1413, 1417 (9th Cir. 1997) (quoting <u>Harris</u>, 885 F.2d at 1364).

25    According to a statistical analysis completed by an expert petitioner retained prior

26  to trial, the panel of all prospective jurors in petitioner's case consisted of 172 persons.  (ACT

18

1    Vol. VII at 1700.)  Those 172 prospective jurors completed, under penalty of perjury, a twelve-

2    page juror questionnaire that inquired, in part, about their knowledge of the case.  (See generally

3    ACT Vol. VII at 1710-21.)  In response to that questionnaire 166 prospective jurors replied that

4    they had heard about the case.  (Id. at 1700.)  Seventy-one of the 166 had formed an opinion

5    about the case.  (Id.)  Of those 71, 45 prospective jurors indicated that their opinion was "so

6    strongly held" that they could not set it aside.  (Id.)  After excusing jurors for hardships and

7    pursuant to stipulations and challenges, the qualified prospective jury panel consisted of 84

8    persons.  (Id. at 1704.)  Of those 84, only 9 had formed an opinion about the case and none of

9    those nine indicated that their opinion was so strongly held that they could not set it aside.  (Id.)

10          Thus, only 45 of 172 prospective jurors (26.1%) indicated that their opinion of

11   petitioner's guilt could not be set aside.  None of those 45 persons were empaneled on

12   petitioner's jury.  Moreover, of the 84 qualified jurors, none indicated that any opinion they had

13   formed was so strongly held that they could not set it aside.  Indeed, only one of the empaneled

14   jurors had even formed an opinion with respect to the case.

15          "In measuring the reliability of a juror's assurances of impartiality, the number of

16   potential jurors who held 'fixed opinions as to the guilt of petitioner' is measured against the

17   number of jurors on the panel."  Collins, 109 F.3d at 1417 (quoting Irvin, 366 U.S. at 727.)  The

18   Supreme Court in Irvin held that jurors had demonstrated a "pattern of deep and bitter prejudice"

19   that "give[s] little weight" to their assurances of impartiality, when 268 prospective jurors had

20   been dismissed for cause from a panel of 430 person (62.3%).  109 F.3d at 727-28.  Here, the

21   percentage of prospective jurors dismissed due to their "fixed opinions as to the guilt of

22   petitioner" was substantially smaller (26.1%).

23          Conversely, the Supreme Court in Murphy held that when "20 of the 78 persons

24   questioned [25.6%] were excused because they indicated an opinion as to petitioner's guilt" an

25   inference of actual prejudice did not exist.  421 U.S. at 803.  The Supreme Court stated that

26   while the number of dismissed jurors may have been "20 more than would occur in the trial of a

totally obscure person" the percentage "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." Id. at 803.  Of course, the percentage of jurors dismissed due to their having formed an opinion of petitioner's guilt in Murphy is nearly identical to the percentage of jurors dismissed in petitioner's case for that reason.

Moreover, whether a jury was biased is a question of fact.  In this case the trial judge entertained two change of venue motions.  In denying the second motion for a change of venue, which was argued after voir dire, the trial judge stated that he was even more confident that petitioner would receive a fair trial before an impartial jury.  In this regard, the trial judge reasoned:

> Getting down to the bottom line, I guess once I had gone through the questionnaires that we have all gone over in great detail, at great length, and excused certain jurors who obviously could not provide [petitioner] a fair trial, the ones we screened, the remaining jurors who have been questioned at length, you know, perhaps not as exhaustively as you might like to have questioned them but certainly to get a better idea about them than you read about on paper - - once we have been through all of that and they have assured us in one manner or another they can be fair and impartial, I am more - - I am less concerned about these overall theoretical risks.  I think your arguments are well meaning and I think they are worth considering, but your arguments are essentially abstractions.

> The proof in my view is actually that this process of voir dire has succeeded in identifying a large panel of jurors who could provide [petitioner] a fair and impartial jury trial, The fact that his case may have had a high amount of media attention and is even a case that had been heard of by a large percentage of the jury pool does not in my view justify on its own a change of venue.

> As I said, once we have read about these jurors and their questionnaires, once we've had the opportunity to individually discuss things with them, I am less concerned about the abstract possibility that some of them have violated their oath to reveal things to us that would bear on their suitability to serve as jurors and their oath to not disclose or discuss the case with anyone else.  Those risks you run and have to account for in every jury trial, but I am less concerned about them in this case having been through the voir dire process.

/////

So my sense is that it was a closer call in my mind although it was not a motion that I thought should be granted before we attempted to impanel a jury.  I think this is precisely the kind of case that the Rules of Court had in mind when they suggest, without requiring, that a trial court attempt to impanel a jury before they grant a change of venue, and I think this is precisely the type of case where it becomes clear.  It's not less clear to me now.  It's more clear to me now that there is not a substantial likelihood or reasonable likelihood that a fair and impartial trial cannot be had in this county.

It's clear to me that a fair and impartial trial can be had in this county because of the exhaustive and thorough nature of the voir dire process, including the questionnaires and our individual examinations of these prospective jurors, and the possible but more abstract possibilities you raise are not a legitimate basis on which to change venue in this case.

(RT at 807-09.)  The trial court's finding that the jury was not biased is entitled to a presumption of correctness.  Casey v. Moore, 386 F.3d 896, 910 (9th Cir. 2004) (citing Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987).

The state appellate court concluded that there was not a reasonable likelihood that the denial of petitioner's change of venue motion resulted in a violation of his right to a fair trial before an impartial jury.  After an independent review of the record, this court concludes that there was not "such a degree of prejudice against petitioner that a fair trial was impossible." Harris, 885 F.2d at 1360 (quoting Bashor, 730 F.2d at 1234.)  See also Daniels, 428 F.3d at 1210.  Thus the decision by the state appellate court was not contrary to, or an unreasonable application of, clearly established federal law.  Petitioner, therefore, is not entitled to federal habeas relief on this claim.

CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus (Docket. No. 1) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one days after being served with these findings and recommendations, any party may file written

21

objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case. See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: June 27, 2010.


_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:6
larmour1523.hc